UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DIANE LLOREN SHORT,

      Plaintiff,

v.                                                                  Case No. 6:19-cv-1695-Orl-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

      Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her application for a period of disability and disability insurance benefits ("DIB"). Following two administrative hearings held by video on October 18, 2017 and September 20, 2018, the assigned Administrative Law Judge ("ALJ") Denise Pasvantis issued a decision, finding Plaintiff not disabled from December 21, 2012, the alleged disability onset date, through March 31, 2017, the date last insured.[2] (Tr. 15-24, 30-65, 93-134.) Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

_____

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Docs. 10 & 13.)

[2] Plaintiff had to establish disability on or before March 31, 2017, her date last insured, in order to be entitled to a period of disability and DIB. (Tr. 15)

## I.      Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.     Discussion

Plaintiff argues that the ALJ erred by failing to properly weigh "the medical opinions of record, based on an adequate rationale and substantial evidence at each step of the sequential evaluation process."  (Doc. 18 at 17-25.)  Specifically,

2

Plaintiff argues that the ALJ erred in giving little to no weight to the opinions of her treating physicians, Dr. Lily Steel, Dr. Ashish Udeshi, and Dr. Mark Pinsky, while according great weight to the opinions of Dr. Craig Nielsen, a one-time consultative examiner, and Scott Miller, M.D., a non-examining State agency physician who testified at the hearing.  (*Id.*)  Plaintiff urges the Court to remand for further administrative proceedings and a supplemental hearing.  (*Id.* at 24-25.)

Defendant counters that the ALJ applied the correct legal standards and that her decision is supported by substantial evidence.  (Doc. 20.)  Defendant asserts that (1) the ALJ properly evaluated the opinions of Dr. Udeshi and Dr. Pinsky; (2) the ALJ's error in failing to directly evaluate Dr. Steel's opinion was harmless; and (3) the ALJ properly gave great weight to the opinion of Dr. Nielsen.  (*Id.* at 4-13.)  The Court finds that the ALJ's decision is not supported by substantial evidence, and, therefore, remands the case for further proceedings.

### A.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. § 404.1520(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

3

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)-(6).  "However, the ALJ is not required to explicitly address each of those factors.  Rather, the ALJ must provide 'good cause' for rejecting a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam), 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244, at *3 (M.D. Fla. Mar. 10, 2008).  Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec.*

4

*Admin.*, 2007 WL 708971, at *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

### B.    Relevant Medical Opinions

#### 1.    Dr. Lilly Steel

On May 27, 2014, Dr. Lilly Steel completed a Physical Treating Source Statement Questionnaire. (Tr. 509-10.) Dr. Steel indicated that she had seen Plaintiff "at least quarterly since 1992." (Tr 509.) Dr. Steel diagnosed Plaintiff with severe low back pain, difficult-to-control hypertension, and Meniere's disease. (*Id.*) Plaintiff's symptoms included severe low back pain requiring multiple medications, fatigue, hearing loss, and difficulty walking. (*Id.*) Dr. Steel then identified the following positive objective signs: abnormal gait, sensory loss, tenderness, muscle spasm, muscle atrophy, and muscle weakness. (*Id.*) Based on Plaintiff's impairments, Dr. Steel opined that she was limited to walking up to

one block without rest; sitting for up to 30 minutes at one time; standing for up to

10 minutes at one time; sitting for less than two hours total in an eight-hour

workday with normal breaks; and standing/walking for less than two hours total in

an eight-hour workday with normal breaks.  (*Id.*)  She also opined that Plaintiff

needed a job permitting her to shift positions at will from sitting, standing, or

walking.  (Tr. 510.)  According to Dr. Steel, Plaintiff could occasionally lift and

carry less than ten pounds, but never more than ten pounds.  (*Id.*)  Dr. Steel

opined that Plaintiff had significant limitations in pushing/pulling and noted that

Plaintiff could never twist, stoop (bend), or climb ladders, but could occasionally

crouch and climb stairs.  (*Id.*)  Dr. Steel also noted that Plaintiff "had severe

physical limitations since December 2012 or earlier.  She has failed numerous

conservative modalities and continues to have significant pain and limitation[s].

She is scheduled for surgery 6/2/2014."[3]  (*Id.*)

### 2.   Dr. Ashish Udeshi

On May 6, 2015, Dr. Udeshi, Plaintiff's pain management physician,

completed a Residual Functional Capacity ("RFC") Form, indicating that he

began treating Plaintiff on October 20, 2014 and "continue[d] to follow her

---

[3] On June 4, 2014, Plaintiff underwent the following surgical procedures for lumbar spondylosis, degenerative scoliosis of L1-S1, and spinal stenosis: "[d]ecompressive laminectomy [of] L2 through the sacrum, bilateral discectomy [of] L5-S1, posterior lumbar interbody fusion [of] L5-S1 . . ., transpedicular instrumentation [of] L1 through S1 . . ., correction of scoliotic spinal deformity with instrumentation[,] and posterolateral fusion [of] L1 through S1 using autologous bone."  (Tr. 437.)  Operative findings were listed as "[r]igid lumbar degenerative scoliosis, severe lateral recess and foraminal stenosis."  (Tr. 440.)

6

monthly for her chronic conditions." (Tr. 647-52.) Dr. Udeshi diagnosed Plaintiff

with chronic lumbar radiculopathy, myofascial pain, chronic low back pain,

lumbar post-laminectomy syndrome, and neuropathy. (Tr. 647.) Plaintiff's

treatment included "medication management with opioid regimen, decreasing

frequency and amount" and physical therapy with pool exercise. (Tr. 648.) Dr.

Udeshi opined Plaintiff's prognosis was favorable, but complete recovery was

unlikely. (*Id.*) He noted Plaintiff continued to "improve since prior

lumbar/thoracic surgery" and expected Plaintiff's disability or impairment to last

one year or more. (*Id.*) Dr. Udeshi opined that Plaintiff was limited to sitting for

less than thirty minutes, standing for up to thirty minutes. (*Id.*) Dr. Udeshi opined

that Plaintiff could not "stand and/or sit upright for six to eight hours" due to

chronic low back and muscle pain. (Tr. 649.) According to Dr. Udeshi, Plaintiff

also had to lie down during the day to relax her muscles and reduce spasms and

tension. (*Id.*) He also indicated that Plaintiff could only walk 40 feet without

stopping; had no limitations in reaching up above shoulders and down to waist

level, carefully handling objects, and handling with fingers; but could rarely reach

down towards the floor. (*Id.*) Dr. Udeshi also noted that Plaintiff was limited to

carrying less than five pounds during an eight-hour period and five to ten pounds

regularly/daily. (*Id.*)

Dr. Udeshi further opined that Plaintiff was limited in her ability to lift, pull,

and hold objects and would have difficulty bending, squatting, and kneeling due

to limited range of motion. (Tr. 650.) He also stated she would have difficulty

turning parts of her body due to decreased lateral rotation, flexion, and extension. (*Id.*)  He also described Plaintiff's pain as chronic with acute exacerbation and her pain level as moderate to severe and worse with activity.  (*Id.*)  Dr. Udeshi opined Plaintiff was credible with regards to her claims of pain and that there were objective medical reasons for her pain, including prior disc changes and recent thoracic/lumbar spine multilevel surgery.  (Tr. 651.)  He opined that Plaintiff could not continue or resume her previous employment but could engage in other work involving "sedentary duty with routine breaks to adjust posture." (*Id.*)  He also opined that Plaintiff's disability was not likely to change over time and found her return-to-work date "difficult to determine" but would "continue to evaluate [on an] ongoing basis." (*Id.*)

### 3.  Dr. Mark Pinsky

On November 24, 2015, Dr. Pinksy completed a Physical Treating Source Statement Questionnaire.  (Tr. 724-26.)  Dr. Pinsky noted he had seen Plaintiff monthly since August 2015 and listed her diagnosed conditions as bilateral pulmonary embolism, lumbar disc disease, microcytic anemia, and peripheral neuropathy.  (Tr. 724.)  Dr. Pinsky identified the following objective signs: abnormal gait, sensory loss, reflex changes (left greater than right), tenderness, crepitus, muscle spasm, muscle weakness, and weight change.  (*Id.*)  He also stated that Plaintiff could not walk a city block, could only walk 50-60 feet, could only sit for 30 minutes at a time, and stand for 10 minutes at a time.  (*Id.*)  Dr. Pinsky also indicated that Plaintiff was limited to sitting for less than two hours

8

total in an eight-hour workday with normal breaks; and standing/walking for less than two hours total in an eight-hour workday with normal breaks.  (*Id.*)  He opined that Plaintiff needed a job which permitted shifting positions at will from sitting, standing, or walking.  (Tr. 725.)  He indicated that Plaintiff could frequently lift and carry less than ten pounds, occasionally lift/carry ten pounds, but never 20 pounds or more.  (*Id.*)  He also opined that Plaintiff would have significant limitations reaching (including overhead), handling (including gross manipulation) due to hands locking, fingering (fine manipulation) due to fingers locking, and pushing/pulling.  (*Id.*)  He also indicated that Plaintiff could never twist, stoop (bend), crouch, climb stairs, or climb ladders.  (*Id.*)  Dr. Pinsky added that Plaintiff could not sit in front of a computer for more than twenty minutes because it triggered vertigo and that she experienced increased swelling in her ankles with increased humidity.  (Tr. 726.)

On May 7, 2017, Dr. Pinsky completed a second Physical Treating Source Statement Questionnaire.  (Tr. 875-77.)  He listed Plaintiff's symptoms as follows: low back pain levels ranging from at least 6/10 to 10/10; numbness and tingling down her left leg into her left foot; dizziness; and excessive fatigue.  (Tr. 875.)  Dr. Pinsky noted that Plaintiff had bilateral lumbar low back pain, greater on the left than the right, which was exacerbated by sitting, standing too long, or walking and noted that she was using an assistive device for walking.  (*Id.*)  He also noted that she experienced bilateral lower extremity weakness, greater on the left than the right.  (*Id.*)  He opined Plaintiff could walk less than one city block, or

only 50 feet, without rest; sit for no more than ten minutes at a time; and stand for no more than fifteen minutes at a time. (*Id.*)  According to Dr. Pinsky, she was limited to sitting for less than two hours total, and standing/walking for less than two hours total, in an eight-hour workday with normal breaks. (Tr. 876.)  He also opined that Plaintiff would need a job which permitted shifting positions at will from sitting, standing, or walking and that she would need to take unscheduled breaks during an eight-hour workday. (*Id.*)  He noted that Plaintiff could occasionally lift and carry less than ten pounds, but never ten pounds or more. (*Id.*)  He opined Plaintiff could never twist, stoop (bend), crouch, climb stairs, or climb ladders. (*Id.*)  He again indicated that Plaintiff had significant limitations doing repetitive reaching, handling, fingering, and pushing/pulling. (Tr. 877.)  Dr. Pinsky further opined that Plaintiff could not sit/stand for more than fifteen to thirty minutes at a time, suffered from debilitating low back pain, and "in addition, if [she] sits in front of [a] computer [for more than] 20 minutes, her vertigo gets triggered." (*Id.*)  He also noted that Plaintiff was taking medication for chronic migraines and migraine prophylaxis that impaired her memory and ability to retrieve information from her memory. (*Id.*)

On October 11, 2017, Dr. Pinsky wrote a letter in support of Plaintiff's application for benefits stating as follows:

> I have offered several opinions regarding Ms. Short's ability to perform tasks required for full time, gainful employment. (November 24, 2015, May 7, 2017).  In forming my opinions, I have relied on clinical evidence including observations of abnormal gait, sensory

loss, reflex changes, tenderness, muscle spasms[,] and muscle weakness.

Additionally, there is objective medical evidence supporting my opinion regarding Ms. Short's limitations due to back pain, for example, an MRI dated June[] 21, 2016, showing an osteophyte pushing against the nerve at L5 on the left side and significant findings of lumbar disc disease.  Ms. Short's claims of fatigue are supported by laboratory results showing low iron levels.  In an effort to alleviate those symptoms, Ms. Short has been treated with iron infusions for her anemia.

Ms. Short's complaints of low back pain have been consistent over time.  She has tried a number of treatment options while under my care, including visits with pain management specialist and physical therapy.  On my advice, Ms. Short saw Dr. David Rosen for a surgical [consultation].
. . .

(Tr. 1141)

### 4.    State Agency Doctors

On March 15, 2017, Plaintiff was examined by R. Craig Nielsen, M.D.  (Tr. 855-62.)  Dr. Nielsen noted that Plaintiff was accompanied by her service dog of two years and had "a rolling/seat walker but could gait without it."  (Tr. 857.) Upon physical examination, Dr. Nielsen found, *inter alia*, that light touch and motor exams of the extremities were normal except Plaintiff stated she felt his "'light touch' very little on [the] lateral lower leg and left foot."  (Tr. 858.)  Plaintiff's deep tendon reflexes measured +3 and equal.  (*Id.*)  Her hand grasp appeared normal and was rated 5 out of 5 bilaterally; fine and dexterous movements of the fingers were also normal.  (*Id.*)  Lying and sitting straight leg raises were negative and there was no atrophy of the extremities.  (*Id.*)  Dr. Nielsen observed that

Plaintiff got on and off her chair and the exam table slowly. (*Id.*) He observed no peripheral joint swelling, redness or deformity, and pain was not elicited with range of motion testing. (*Id.*) He also opined that "two of three Waddell's signs for confabulation or psychogenic cause were positive"; "axial loading was negative but positive for very light tapping of her low back caused immediate pain and concurrent hip/shoulder twisting caused low back pain." (*Id.*) Dr. Nielsen opined that Plaintiff's range of motion was normal. (Tr. 860-62.) In terms of Plaintiff's gait and station, Dr. Nielsen noted she came in using a rolling walker but could walk without it and upon leaving the office, she "continued to use her walker but had an even, fairly brisk, pace." (Tr. 868.) He also observed that Plaintiff "[h]eel and toe walks [sic] well but takes very short steps. Squats and unsquats [sic] with some difficulty but successfully. When getting up, lightly holds on to the table next to her as she does with straightening up from bending at the waist. No assistive device was used or required." (*Id.*)

Dr. Nielsen's impressions were (1) status-post laminectomy with stated persistent low back pain, possible failed low back; (2) obesity with BMI of 37.3; (3) status-post multiple pulmonary emboli; and (4) untreated depression. (*Id.*) He opined Plaintiff's prognosis was "fair, perhaps guarded." (*Id.*) He further explained:

> I sense a definite psychogenic component to her low back pain but find it difficult to sort out objectively how much pain she [is] having and to what degree it [is] incapacitating. I [am] surprised that a rolling walker was recommended. To me, that would hurt low back hygiene rather than help.

> I found no objective weakness that she complained about; no
> muscle wasting.  One attached document from a physiatrist dated
> 10/20/14 does [not] support her claim of intermittent bilateral leg
> par[e]sthesias beginning post op[eratively] and I would [not]
> reasonably expect surgery to result in that bilateral leg complaint.

(*Id.*)  He opined that Plaintiff could resume secretarial work and that some of her work-related "activity problems could be related to her overweight problems." (*Id.*)  Dr. Nielsen further opined that Plaintiff's "chronic low back pain might well be conversion reaction," which he described as a "psychiatric illness, not a physical illness, but [which] [could] be equally debilitating." (Tr. 859.)

On October 29, 2017, the State agency non-examining consultant, Scott Miller, M.D., completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) (Tr. 1142-47) and a Medical Interrogatory[,] Physical Impairment(s)--Adults form (Tr. 1149-52).  Dr. Miller opined that, due to Plaintiff's chronic lumbar radiculopathy, she was limited to lifting and carrying up to ten pounds frequently, eleven to twenty pounds occasionally, but never more than twenty pounds.  (Tr. 1142.)  He further opined that, during an eight-hour workday, Plaintiff could sit for four hours, stand for two hours, and walk for two hours at one time without interruption.  (Tr. 1143.)  He also opined she could sit for four hours, stand for two hours, and walk for two hours total during an eight-hour workday.  (*Id.*)  He opined that Plaintiff did not require a cane to ambulate and, although Plaintiff used a rolling walker at times, the objective evidence did not support its use.  (*Id.*)

Dr. Miller also opined that Plaintiff could frequently perform activities

13

involving reaching (overhead), reaching (all other), handling, fingering, feeling, and pushing/pulling and that there were no upper extremity limitations noted in the record.  (Tr. 1144.)  He also noted that Plaintiff could frequently operate foot controls with her right foot and occasionally with her left foot.  (*Id.*)  Dr. Miller attributed Plaintiff's chronic pain syndrome to "her L5 nerve root [compression] on the left" and as the basis for his restrictions.  (*Id.*)

Based on Dr. Nielsen's physical exam and assessment, Dr. Miller also opined that Plaintiff could occasionally climb stairs and ramps, stoop, and kneel, but could never climb ladders or scaffolds, balance, crouch, or crawl.  (*Id.*)  Dr. Miller noted that Plaintiff could never be exposed to unprotected heights; occasionally to extreme cold, heat, and vibrations; frequently to moving mechanical parts, operating a motor vehicle, humidity and wetness, and to dust, odors, fumes, and pulmonary irritants; and frequently to loud noise.  (Tr. 1146.)  He also noted that Plaintiff required chronic pain medication which could cause problems working at unprotected heights.  (*Id.*)  Dr. Miller also responded to a Medical Interrogatory and included a Medical Expert Statement providing details regarding his opinion that Plaintiff's conditions did not meet or equal the listing for disorders of the spine, migraine headaches, hypertension, hypothyroidism, or Meniere's disease.[4]  (Tr. 1152.)

---

[4] Of note, in explaining the basis for his opinion that Plaintiff did not meet or equal the listing of disorders of the spine, Dr. Miller noted as follows:

## C.    The ALJ's Decision

At step two of the sequential evaluation process,[5] the ALJ found that

Plaintiff had the following severe impairments: degenerative disc disorder of the

lumbar spine, status-post laminectomy and fusion; and obesity.  (Tr. 18.)  The

ALJ also found that Plaintiff's migraines and vertigo were non-severe

impairments.  (*Id.*)  At step three, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments.  (*Id.*)

The ALJ then found that Plaintiff had the RFC to:

[L]ift and/or carry twenty pounds occasionally and ten pounds
frequently, stand two hours without interruption and two hours total
in an eight-hour day, walk two hours without interruption and two
hours total in an eight-hour day, sit four hours without interruption

---

While the claimant has an extensive history of lumbar disc disease[,] her
subjective complaints of pain do not correlate with the objective physical
findings.  While the claimant had [a] laminectomy and fusion of L1-L5 in
June of 2014 [] for [low back pain][,] she continues to have pain
postoperatively that has been felt to be somewhat due to ongoing issues
with [the] L5 nerve root compression[,] but the latest neurosurgical
[e]valuation found [at] [Exhibit 25F] suggests that there is more than the
nerve root issue contributing to her functional limitations implying that
some psychological issues may be playing a role.  Similar issues were
noted during her disability exam on 3-15-17 . . . .  It is my opinion that the
claimant can actively participate in some work related activities like
secretarial work but with the limitations noted in the Medical Source
Statement.  There are other treatment options being recommended by the
latest treating Neurosurgeon that may also help with the patient's pain
syndrome.  It is also noted that as of 3-13-15, the [c]laimant was able to
climb a ladder as reported by the ER visit note found at [Exhibit 13F, p.
16].
(Tr. 1152.)

---

[5] The Commissioner employs a five-step process in determining disability.  *See*
20 C.F.R. § 404.1520(a)(4).

and four hours total in an eight-hour day, frequently operate foot
controls with the left foot and work around wetness and/or humidity
and atmospheric conditions such as [] fumes, odors, dust, and
gases, occasionally stoop, kneel, climb ramps and stairs, operate
foot controls with the right foot, and work around extreme cold,
extreme heat, and vibration, and never crouch, crawl, climb ladders,
ropes and scaffolds[,] and work around unprotected heights.

(Tr. 19.)

In making this finding, the ALJ discussed, *inter alia*, Plaintiff's subjective

complaints, the objective medical findings, the treatment and examining records,

and the opinion evidence.  (Tr. 19-24.)  In considering Plaintiff's symptoms, the

ALJ summarized her hearing testimony as follows:

[Plaintiff] is fifty-two years old and has two years of college
education.  She was certified as a paralegal and worked in the field
until December 2012.  The claimant explained she has been using a
walker to ambulate since her back surgery in 2014.  She is unable to
work due to pain in her lower back, left wrist and right knee, as well
as migraines and vertigo.  She explained that the pain medication
helps take the edge off, but she always has some pain.  She also
feels pins/needles and bugs crawling on her legs.  The claimant has
migraines twice a week, lasting five hours to two days, depending on
how fast she takes the medication.  Her medications cause fatigue
and word retrieval issues.  She is able to prepare simple meals, and
can perform some household chores such as laundry and grocery
shopping using a cart.  The back pain shoots down to her kneecap
and she has muscle spasms in her back, calves[,] and thighs at
night.  On average her pain level is 3-5, and on bad days up to an 8.
She indicated that she has muscle weakness and has problems
walking.  She is exhausted all the time and she only wants to sleep.
The claimant stated the infusions did not work.  The pain also affects
her mental state; she has no patience and lacks concentration.  She
estimated being able to sit for up to thirty minutes, on a good day[,]
and stand for fifteen to twenty minutes before getting shooting pain
down her left leg.  She claimed to be unable to walk more than
twenty feet without the rolling walker due to balance problems.  She
goes to the gym three times a week, one of those days she
exercises with a professional trainer.  The rest of the days, she does

16

physical therapy exercises in her pool.  It takes some time for her to get up in the morning; she usually waits until the pain medication kicks in.  She is able to do light chores, such as dishwashing, meal preparation, and makes her bed.

(Tr. 19-20.)

The ALJ also summarized the hearing testimony of the State agency medical expert, Dr. Scott Miller, as follows:

[Dr. Miller] was asked to clarify his assessment in the medical interrogatory he had previously submitted (Exhibit 31F).  He opined the claimant could lift and/or carry up to twenty pounds occasionally and up to ten pounds frequently.  She could stand for two hours, walk for two hours and sit for four hours in an eight-hour workday.  He noted that nerve root compressions are in general not debilitating to the point where the person cannot ambulate.  Thus[,] he believed that the use of a walker to ambulate does not appear to be substantiated by the amount of disease the claimant has.  Her physicians have recommended weight loss and exercise on multiple occasions, but an assistive device was not indicated.  When questioned about the progress notes documenting severe limitation with walking, the medical expert noted these were not from a physician, rather from [a] physical therapist.  Nevertheless, Dr. Miller explained that the claimant's six-level fusion in 2014 appeared to be successful.  He further noted that [it] is well documented that fusion reduces pain and improves the ability to ambulate, and it generally improves the patient's condition.  Degeneration in the non-fused areas could occur, however, he did not see anything in the objective evidence in this case to indicate that might be happening.  It would show up on examination as weakness in [the] lower extremities and bilateral straight leg raising testing, but it has not shown in this case.  He directed us to 33F and 20F where neither physician has found any weakness in the lower extremities.  When referred to exhibit 13F, Dr. Miller explained that there was tenderness, which [did] not surprise him, but it very clearly state[d] the claimant had normal gait.  The findings have to show up on a physical examination to be objective evidence, not a mere comment.  He further testified that in 20F there is a thorough range of motion examination, which did not reflect any decrease throughout the examination.  He opined she would be able to stoop on occasion, and that may improve as the spine compensates itself.  However, he disagrees with a total

17

limitation in stooping.  Dr. Miller indicated that the MRI scans show the same findings, nerve root compression; but, again, the physical examinations did not reveal any significant sensory abnormalities. The claimant has no restrictions in the use of her upper extremities.

(Tr. 20.)  The ALJ then found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*)  Specifically, the ALJ found that Plaintiff's testimony was "not supported by the medical evidence of record and her activities of daily living [were] inconsistent with her complaints."  (*Id.*)  The ALJ also found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "inconsistent because the objective evidence [did] not support the extent of the alleged complaints during the period at issue."  (*Id.*)

After summarizing the objective medical evidence (Tr. 21-22), the ALJ also summarized the consultative evaluation of Dr. Nielsen, as follows:

[Dr. Nielsen] evaluated the claimant on March 15, 2017.  She reported having significant pain, nerve damage and weakness since her back surgery in 2014.  She also had numbness and tingling in her toes and feeling like bugs crawling up her legs.  The physical examination evidenced negative straight leg raising test bilaterally. The claimant told the examiner she had "guarding" because she did not want to be in more pain.  She got on and off the examination table and chair slowly.  The claimant had full range of motion in all joints.  Dr. Nielsen noted that the claimant came in using a rolling walker, but she was able to walk without it.  In fact, he observed the claimant as she left the office, using the walker but with an even, fairly brisk pace.  His [sic] heel and toe walks were well [sic] but [sic]

> very short steps.  She squatted with difficulty but successfully.  No
> assistive device was used or required.  He further noted he was
> surprised a rolling walker was recommended as it would hurt her
> back more than help.  He found no objective weakness that she
> complained about, and no muscle wasting.  Her claim of intermittent
> bilateral leg paresthesias she claimed began post operatively [was]
> not supported and he would not have expected surgery to result in
> bilateral leg complaint.

(Tr. 22-23.)  The ALJ then accorded great weight to the opinion of Dr. Nielsen

that Plaintiff "would be able to resume secretarial work."  (Tr. 23.)  The ALJ

explained that Dr. Nielsen "reviewed the medical evidence of record and

performed a thorough examination of the claimant" and his "opinion was based

on the objective findings and are consistent with those contained in the medical

evidence of record."  (*Id.*)

Next, the ALJ summarized the opinions of Dr. Udeshi and Dr. Pinski and

accorded these opinions little weight, finding that they were "not consistent with

the objective findings in the medical evidence of record."  (*Id.*)  The ALJ reasoned

as follows:

> The limitations appear to be based on the claimant's self-reports and
> not the objective physical examinations which, as detailed above,
> consistently showed normal gait and no neurological deficits.  The
> Medical Expert studied and reviewed the entire medical record.
> Thus, he had a comprehensive overview of all medical evidence in
> the file and was able to weigh and evaluate the data and opinions
> provided by treating and consulting medical sources.  As such, I find
> his opinions and conclusions to be most reasonable and convincing.
> Accordingly, the undersigned hereby accepts Dr. Miller's testimony
> and recommendations with regard to the severity of the claimant's
> impairments and limitations arising therefrom . . . .

(Tr. 23-24.)  In sum, the ALJ concluded, the RFC assessment was "supported by

the objective findings in the record, including the consultative examiner as well as the medical expert's opinion."  (Tr. 24.)

Then, at step four, the ALJ determined that, through the date last insured, Plaintiff was capable of performing her past relevant work as a paralegal.  (Tr. 24.)  In making this determination, the ALJ relied on the testimony of a vocational expert ("VE") who testified that Plaintiff would be able to perform her past work as a paralegal, requiring light exertion work with a Specific Vocational Preparation ("SVP") of 7, "but performed at sedentary and light."  (*Id.*)  The ALJ found that Plaintiff could perform this work both as "actually and generally performed."  (*Id.*)  Thus, the ALJ concluded that Plaintiff was not disabled from March 4, 2015 through March 31, 2017, the date last insured.  (*Id.*)

### D.   Analysis

The Court agrees with Plaintiff that the ALJ's evaluation of the medical opinion evidence warrants a remand.  As noted previously, in an RFC Form completed on May 6, 2015, Dr. Udeshi opined, in part, that in an eight-hour workday, Plaintiff could only sit for less than thirty minutes, stand for thirty minutes, and lift/carry up to ten pounds; would need to lie down during the workday to relax her muscles and reduce spasms and tension; and would have difficulty bending, squatting, kneeling and turning her body.  (Tr. 648-50.)  In a Medical Statement completed on November 24, 2015, Dr. Pinsky opined, in part, that in an eight-hour workday, Plaintiff could only sit for less than two hours total, and stand/walk for less than two hours total; would need a job that permitted her

20

to switch positions at will from sitting, standing, or walking; could frequently lift/carry less than ten pounds, occasionally lift/carry ten pounds, but never more than 20 pounds; she could never twist, stoop (bend), crouch, climb stairs, or climb ladders; and could not sit in front of a computer for more than twenty minutes.  (Tr. 724-26.)

In a Medical Statement completed May 7, 2017, Dr. Pinsky opined, in part, that Plaintiff had bilateral lumbar back pain, greater on the left, which was exacerbated by sitting, standing too long, or walking.  (Tr. 875.)  Dr. Pinsky noted that she was using an assistive device for walking and she experienced bilateral lower extremity weakness, greater on the left than the right.  (*Id.*)  He opined that she could sit/stand for 30 minutes at a time and, in an eight-hour workday, she could only sit for less than two hours total and stand/walk for less than two hours total; she would need a job that permitted her to switch positions at will from sitting, standing, or walking and would need to take unscheduled breaks; she could occasionally lift/carry less than ten pounds; she could never twist, stoop (bend), crouch, climb stairs, or climb ladders; and could not sit in front of a computer for more than twenty minutes.  (Tr. 875-77.)  In a letter dated October 11, 2017, Dr. Pinsky stated that he based his previous opinions on "clinical evidence, including observations of abnormal gait, sensory loss, reflex changes, tenderness, muscle spasms, and muscle weakness" and that the objective medical evidence, including the June 21, 2016 MRI, supported his opinions regarding Plaintiff's limitations due to back pain.  (Tr. 1141.)

21

The ALJ assigned little weight to the opinions of Dr. Udeshi and Dr. Pinsky and explained that these opinions were "not consistent with the objective findings in the medical evidence of records" and that the "limitations appear to be based on the claimant's self-reports and not the objective physical evidence which . . . consistently showed normal gait and no neurological deficits." (Tr. 23.) However, the ALJ's statement that the opinions of Dr. Udeshi and Dr. Pinsky were not consisted with the objective findings in the medical evidence of record is not supported by substantial evidence.

Even after Plaintiff's surgery on June 4, 2014, her examinations were positive for abnormal gait, decreased range of motion, reduced muscle strength and paresthesias in the lower extremities, left more severe than the right. (*See, e.g.*, Tr. 516-17 (noting, on October 20, 2014, back pain, decreased range of motion, joint pain, muscle weakness, myalgia, antalgic gait, and reduced muscle strength in the left lower extremity); Tr. 522-23 (noting, on November 3, 2014, neurological review of systems was positive for numbness, trouble walking, and tingling and physical examination revealed decreased sensory perception to light touch at left L5 and S1 and pain with trunk extension); Tr. 542-43; Tr. 655.) Physical exam findings specifically noted weakness in Plaintiff's left leg, tibialis anterior ("TA") muscle, and foot drop. (*See* Tr. 667 ("Left TA weakness at 4/5. Mild left sided antalgic gait."); *see also* Tr. 785, 790, 796, 801, 808, 815, 821, 834, 848 (same).)

Moreover, Plaintiff's physical therapy treatment notes consistently noted antalgic gait, described as a Trendelenburg gait pattern, and left lower extremity weakness.  (*See* Tr. 553-55 (noting, on October 9, 2014, that Plaintiff "currently ambulates with rolling walker, forward posture, and decreased step length with noted Trendelenburg gait"; finding reduced range of motion in the lumbar spine and reduced strength, more pronounced on the left than the right, of the hip flexors, hamstrings, quadriceps, tibialis anterior, gastrocnemius, abdominals, and hip abductors; decreased sensitivity of in the left lower extremity L3-L5 nerve distribution; and decreased reflexes in the left lower extremity); Tr. 584 (noting, on October 16, 2014, that Plaintiff's left foot was "very weak and as a result she tends to drag [her] foot when she walks"); Tr. 587 (noting, on October 23, 2014, that Plaintiff rolled her left ankle during physical therapy and that her left ankle and leg weakness contributed to her antalgic gait); Tr. 595 (noting antalgic gait pattern due to left lower extremity weakness); Tr. 943-44 (observing that Plaintiff "ambulates with antalgic gait pattern and sway[s] during gait"); Tr. 1020 (noting detailed objective analysis of Plaintiff's abnormal gait.)

Physical examinations also revealed positive objective findings, including positive Patrick's and FABER testing as well as positive straight leg raises.  (*See, e.g.*, Tr. 643-45 (noting, on December 8, 2014, that Plaintiff "demonstrate[d] pain and point tenderness over the affected gluteal and sacroiliac joint line," "positive PATRICK and FABRE's Sign," and recommending a left sacroiliac therapeutic joint block); *see also* Tr. 747, 897-900, 904.)  After the onset date, Plaintiff's

posture was also noted as kyphotic and forward-leaning.  (Tr. 1020 (noting, on April 11, 2017, Plaintiff demonstrated "a more normalized heel to toe gait pattern but she continue[d] to maintain a forward flexed trunk and [would] demonstrate a lateral trunk lean as she start[ed] to fatigue," and that she was able to "transition completely off her [assistive devices] in the home but [would] still use her rolling walker or cane for longer distance mobility due to back and knee pain").)  In July 2016, physical examination revealed positive objective findings, including positive straight leg raise on the left, prompting a referral to neurosurgeon David S. Rosen, M.D. for a surgical evaluation.  (*See* Tr. 899-900 (noting "[t]enderness to palpitation along the L5-S1 [l]eft lateral traverse process, increased back pain with forward flexion and improvement with extension, normal range of motion, positive bench on the left[,] [] positive straight leg raise on the left[,] and decreased ability to get up on her toes on the left or walk on her heel [on] the left").)

A number of physical examinations indicated that Plaintiff appeared to be in moderate to severe pain, had decreased range of motion and tenderness to palpitation in the lumbar spine, had lumbar kyphosis, radiation of pain into the left lower extremity, as well as numbness and tingling in the lower extremities.  (*See* Tr. 516-49, 610-46, 653-75, 728-852, 878-929; *see also* Tr. 999 (noting Plaintiff had "significant lumbar kyphosis with some positive sagittal balance").)  Dr. Pinsky also noted that "an osteophyte pushing directly against the nerve at L5 on the left side . . .[,] along with significant findings of lumbar disc disease[,] clearly

24

explain[ed] the patient's disability and concur with findings on physical examination that have been done in the past."  (Tr. 899.)

Further, the results of the diagnostic testing were not inconsistent with the treatment notes.  (*See* Tr. 636 (stating that the lumbar spine X-rays from December 2, 2014 showed "severe degenerative disc disease . . . [at] L3-S1," mild degenerative disc disease at L1-L3, "[s]tatus-post bilateral pedicle screw fusion L1-S1," and "[m]ild residual levoscoliosis"); Tr. 664 (a lumbosacral spine MRI dated March 26, 2015 showing "[f]usion with bilateral screws L1-S1 noting no evidence of mechanical failure," "[r]esidual facet and disc-osteophyte complex are greater at the right L4/5 lateral recess, bilateral L4/5 neural foramen and the left L3/4 neural foramen and lateral recess," and recommending assessment "for radicular symptoms"); Tr. 864 (stating that an MRI of the right knee from December 29, 2016 showed, *inter alia*, "[h]orizontal oblique inferior articular surface tear posterior horn medial meniscus extending internally toward the notch, and adjacent to tear in coronal image 7, there is a very prominent radial tear in the posterior horn medial meniscus with a 4 mm wide tear zone, which is likely contributing to mechanical instability, and there is extrusion into the medial gutter"; "Severe Grade II tear [of the] medial collateral ligament without rupture"; "degenerative disease in the medial compartment"; "moderate sprain of the medial retinacular insertion without rupture"; "relatively severe sprain of the medial patellofemoral ligament with blurring and hyperintensity of fibers, which are surrounded by edema"; and noting the "patella may not be stable"); Tr. 866

25

(stating that an MRI of the lumbar spine from June 21, 2016 showed, *inter alia*, "a convex left lumbar scoliosis"; "a disc protrusion at T11-T12, which causes no cord contact or deformity"; a "herniation of disc material leftward at the L2-L3 level and also broadly at the L3-L4 and L4-L5 level[s]"; and "a very prominent leftward lateral protrusion of osteophyte, which displaces the exited left L5 root outside its foramen prominently"); Tr. 999-1000 (noting, on July 25, 2016, that review of Plaintiff's MRI of the lumbar spine and X-rays "show[ed] evidence of her previous extensive surgical intervention . . . [and] in particular of L5-S1 neural foraminal stenosis and likely compression of the left L5 nerve root as well as other areas of mild to moderate neural compression").)

The records also show that Plaintiff had failed conservative treatment, including physical therapy.[6]  (*See* Tr. 550-60, 930-53, 956-98, 1001-90.) Moreover, upon referral, Dr. Rosen noted that it appeared that Plaintiff's 2014 surgical procedure failed to provide long term benefits, resulting in a diagnosis of post laminectomy syndrome, status post long segment lumbar fusion.  (Tr. 999-1000).  According to Dr. Rosen, "compression of [Plaintiff's] left L5 nerve root contributed to some of her left lower extremity symptoms," but he opined that "her functional limitation [was] attributable to more than simply this nerve root compression."  (Tr. 1000.)  Dr. Rosen also opined that further surgical

---

[6] The record shows Plaintiff consistently participated in physical therapy, performed exercises at home and at the gym, and participated in aquatic physical therapy.  (*See* Tr. 550-60, 930-53, 956-98, 1001-90.)

intervention was "unlikely to improve her global functional status and discussed the options of spinal cord stimulator trials versus intrathecal drug pumps" with Plaintiff.  (*Id.*)  As discussed above, it appears that the ALJ did not adequately consider the medical evidence as a whole.  Based on the foregoing, the Court cannot conclude that the ALJ's evaluation of Dr. Pinsky's and Dr. Udeshi's opinions is supported by substantial evidence.

Additionally, the ALJ never weighed the opinion of Dr. Steel (Tr. 509-10) who opined, *inter alia*, that Plaintiff had severe physical limitations, including limited ability to walk, sit, and stand, that she required a job that would allow her to shift positions at will from sitting, standing, and walking, and that she could never twist, stoop (bend), or climb ladders.  (Tr. 510.)  Because the ALJ did not discuss Dr. Steel's opinion in her decision, it is unclear whether the ALJ adequately considered each of these treating doctors' opinions separately, as well as in combination, when determining the RFC.  To the extent the opinions were consistent with one another, the ALJ was required to take that into consideration in weighing them.  *See* 20 C.F.R. § 404.1527(c)(4).  However, based on the foregoing, the Court can only speculate as to whether that happened here.  As such, this case will be remanded with instructions to the ALJ to re-consider the medical opinions of record.

Accordingly, it is **ORDERED**:

1.    The Commissioner's decision is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to

conduct the five-step sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources, and conduct any further proceedings deemed appropriate.

2. The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3. In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** in Jacksonville, Florida, on September 29, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record